UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 19-1268-JGB(Ex)** | Date | September 16, 2020 |
| Title | ***J.G. v. Los Angeles Unified School District*** | | |

| | |
|---|---|
| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| MAYNOR GALVEZ | Not Reported |
| Deputy Clerk | Court Reporter |
| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| None Present | None Present |

**Proceedings:** **Order GRANTING-IN-PART and DENYING-IN-PART Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 61) (IN CHAMBERS)**

Before the Court is minor Plaintiff J.G.'s ("Plaintiff") motion for partial summary judgment ("Motion," Dkt. No. 61) pursuant to Federal Rule of Civil Procedure ("Rule") 56. The Court determines the Motion is appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After consideration of the papers filed in support of and in opposition to the Motion, the Court GRANTS-IN-PART and DENIES-IN-PART the Motion.

## I. BACKGROUND

On February 20, 2019, J.G., through his parents as his guardians ad litem, filed a complaint against Los Angeles Unified School District (the "District"). ("Complaint," Dkt. No. 1.) In the Complaint, J.G. alleged that he was a seventeen-year-old student diagnosed with Down Syndrome attending a special education center within the District. (Complaint ¶ 2.) The Complaint alleged several federal causes of action arising out of the District's alleged failure to consider J.G. for integrated schooling and otherwise accommodate his disability. (See generally id.)

On July 1, 2019, Plaintiff filed an amended complaint. ("FAC," Dkt. No. 24.)[1] In the FAC, Plaintiff alleges two causes of action: (1) violations of the Americans with Disabilities Act of 1990 ("ADA"); and (2) violations of Section 504 of the Rehabilitation Act of 1973 ("Section 504").[2] On October 9, 2019, the District filed an answer. ("Answer," Dkt. No. 40.) On December 31, 2019, Chief Judge Virginia A. Phillips transferred this matter to the Court. ("Transfer Order," Dkt. No. 48.)

On June 22, 2020, Plaintiff filed the Motion. (See Motion.) In support of the Motion, Plaintiff filed a memorandum of points and authorities ("Memo," Dkt. No. 61-1), a separate statement of undisputed facts ("PSUF," Dkt. No. 61-2), two proposed orders (Dkt. No. 61-3–4), and a request for judicial notice ("PRJN," Dkt. No. 62).[3] In addition, Plaintiff filed:

- An index of evidence ("Index Part One," Dkt. No. 62);
  - Declaration of Martha F. ("Martha Declaration," id. at 5);
  - Declaration of Wilmer J. Harris ("Harris Declaration," id. at 9);
  - Exhibits A–F ("Exhibits A–F," id. at 13–145);
- A second index of evidence ("Index Part Two," Dkt. No. 63);
  - Exhibits G–N ("Exhibits G–N," id. at 4–187).

On June 29, 2020, Defendant opposed the Motion. ("Opposition," Dkt. No. 65.)[4] In support of the Opposition, Defendant filed objections to evidence ("Def. Obj.," Dkt. No. 65-1), a statement of undisputed facts ("DSUF," Dkt. No. 65-2), and a request for judicial notice ("DRJN,"

---

[1] The FAC added Superintendent Austin Beutner as a party. (See FAC.) On September 10, 2019, the parties stipulated to dismiss Beutner as a party. (Dkt. No. 33.)

[2] The FAC alleged a third cause of action for denial of due process pursuant to 42 U.S.C. § 1983. (See FAC.) On September 11, 2019, the Honorable R. Gary Klausner granted-in-part a motion to dismiss and dismissed the third cause of action. ("MTD Order," Dkt. No. 36.)

[3] Plaintiff requests that the Court take judicial notice of the District's 2017-2018 school year instructional calendar, available on the District's official website. (See PRJN.) The calendar is appropriate for judicial notice. See Gerritsen v. Warner Bros. Entm't Inc., 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) ("Under [Federal Rule of Evidence] 201, the court can take judicial notice of [p]ublic records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies.") (internal quotations omitted). The Court GRANTS the PRJN and takes judicial notice of the District's 2017-2018 instructional calendar.

[4] Defendant requests denial of the motion or a finding of disputed facts because compound facts in the PSUF violate the Court's standing order. (Opposition at 15–16.) Because Defendant does not argue that it was prejudiced by the violation and Plaintiff otherwise substantially complied with the standing order, the Court declines to deny the Motion or find disputed facts on that basis.

Dkt. No. 65-3).[5] In addition, Defendant filed an index of evidence ("Defendant's Index," Dkt. No. 65-4) containing:

- Declaration of Anoush Boyajian ("Boyajian Declaration," id. at 4);
- Exhibit 3 ("Exhibit 3," id. at 9);
- Declaration of Sally Weinberger ("Weinberger Declaration," id. at 17);
- Exhibit 4 ("Exhibit 4," id. at 20);
- Declaration of Matthew R. Hicks ("Hicks Declaration," id. at 24);
- Exhibits 5–11 ("Exhibits 5–11," id. at 28–64);
- Declaration of Lynne Cripe ("Cripe Declaration," id. at 69);
- Declaration of Marshall Fenig ("Fenig Declaration," id. at 72).

On July 6, 2020, Plaintiff replied to the Opposition. ("Reply," Dkt. No. 66.) In support of the Reply, Plaintiff filed objections to evidence. ("Pl. Obj.," Dkt. No. 67.)

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Id. at 325. Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case. Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250.

If the moving party has sustained its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. The non-moving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "This burden

[5] Defendant requests judicial notice of two documents: (1) the request for an Office of Administrative Hearings ("OAH") due process hearing in J.G. v. Los Angeles Unified School District, OAH Case No. 2018040273 (OAH April 5, 2018) (hereinafter "OAH Complaint"); and (2) the notice of dismissal in the OAH case, dated May 21, 2018 (hereinafter "OAH Order"). (See DRJN.) The Court may properly take judicial notice of both documents. See Intri-Plex Technologies, Inc. v. Crest Group, Inc., 499 F.3d 1048, 1052 (9th Cir. 2007) (holding that courts may properly take judicial notice of public documents in other court proceedings). The Court thus GRANTS the DRJN and takes judicial notice of both documents.

is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle, 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

Critically, a trial court "may only consider admissible evidence when reviewing a motion for summary judgment." Weil v. Citizens Telecom Servs. Co., LLC, 922 F.3d 993, 998 (9th Cir. 2019) (citing Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002)); see Fed. R. Civ. Proc. 56(e). At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial. See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003); Block v. City of Los Angeles, 253 F.3d 410, 418–19 (9th Cir. 2001).

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. OBJECTIONS

Plaintiff and Defendant object to various items of evidence submitted by the opposing party. (See generally Def. Obj.; see generally Pl. Obj.) Both parties make evidentiary objections on the bases of relevancy, misstatements of evidence, speculation, and other redundant grounds. However, "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus redundant and need not be considered. Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted."). The Court therefore OVERRULES all such objections by the parties. To the extent any evidentiary objections are unaddressed in this Order, they are OVERRULED. Capitol Records, LLC v. BlueBeat, Inc., 765 F. Supp. 2d 1198 n.1 (C.D. Cal. 2010).

### A. Defendant's Objections

- Defendant objects to the Martha Declaration on the basis that Plaintiff failed to properly authenticate the translation of the declaration. (Def. Obj. at 2.) Although the Ninth Circuit has required documents to be properly authenticated on a motion for summary judgment, "[w]hether the authentication requirement should be applied to bar evidence when its authenticity is not actually disputed is... questionable." Burch, 433 F. Supp. 2d at 1120. Significantly, the Ninth Circuit has held that a district court's consideration of unauthenticated evidence in conjunction with a motion for summary judgment is harmless error when a competent witness with personal knowledge could have authenticated the document. Hal Roach Studios, Inc. v. Feiner & Co., 896 F.2d 1542, 1552 (9th Cir. 1990). Defendant does not appear to dispute the accuracy of the Martha

Declaration. Moreover, Martha F. and the translator could authenticate the document at trial. As a result, Defendant's objection is OVERRULED.

**B. Plaintiff's Objections**

- Plaintiff objects to the Boyajian Declaration on the grounds that she lacks personal knowledge. (Pl. Obj. ¶¶ 78–79.) In particular, Plaintiff objects to the declaration to the extent it claims knowledge of the existence of an integration program at Lowman Special Education Center in years that Ms. Boyajian was not an employee of the school. Ms. Boyajian testified that she has been the principal at Lowman Special Education Center since April of 2017. (Boyajian Declaration ¶ 1.) She did not testify that she worked at the school in any other capacity prior to April of 2017 or identify any other source of knowledge pertaining to the school's integration program. Thus, the Court SUSTAINS the objections as to any period of time prior to April of 2017.
- Plaintiff objects to the District's various assessment reports of J.G. on grounds that they are hearsay, unauthenticated, and lack foundation. (Pl. Obj. ¶¶ 88-90.) As to the first ground for objection, the reports are not hearsay because they are not submitted for the truth of their content. Fed. R. Evid. 801(c)(2)("'Hearsay' means a statement that[]… a party offers in evidence to prove the truth of the matter asserted in the statement."). Instead, the reports are relied on by Defendant as proof that evaluations of J.G. were conducted. As to the latter two grounds for objection, the Hicks foundation adequately lays a foundation for the reports. (Hicks Declaration ¶¶ 6–7.) Moreover, as detailed above, the District need not authenticate the report for purposes of the Motion. Burch, 433 F. Supp. 2d at 1120. The objections are OVERRULED.
- Plaintiff objects to the Weinberger, Fenig, and Cripe Declarations on the basis that all three testify that "[b]ased on [their] personal observation of Plaintiff J.G. during [their] years teaching him… [they] believe his placement at Lowman was proper and appropriate for those years [they] taught him." (Pl. Obj. at 12–13, 17.) According to Plaintiff, any such testimony is improper expert opinion. (Id.) The Court disagrees. Lay witnesses are permitted to provide opinion testimony rationally based on their perception. Fed. R. Evid. 701. Moreover, while the testimony is probative towards an ultimate issue of fact, the meaning of the terms "proper" and "appropriate" is common knowledge and in this context has no unique legal significance that might require professional expertise. "A lay witness may testify as to an ultimate issue of fact, so long as the testimony is otherwise admissible." United States v. Crawford, 239 F.3d 1086, 1090 (9th Cir. 2001). Thus, Cripe, Fenig, Weinberger are permitted to testify regarding their opinions of the propriety of J.G.'s placement, so long as those opinions are based on their perceptions. The Court OVERRULES Plaintiff's objections.

## IV. FACTS[6]

The material facts set forth below are sufficiently supported by admissible evidence and are uncontroverted. They are "admitted to exist without controversy" for purposes of the Motion. See Fed. R. Civ. P. 56(e)(2); L.R. 56-3. The Court deems facts undisputed when the parties' "disputes" of that fact are merely restatements of the same fact, do not actually contradict the substance of a fact, or argue the relevancy and materiality of an otherwise undisputed fact. See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

### A. Plaintiff J.G.

J.G. is an eighteen-year-old student who resides with his parents in Los Angeles County, California. (PSUF ¶ 1.) Since 2004 and at all relevant times, J.G. has received special education services and attended school in the Los Angeles Unified School District. (Id. ¶¶ 2–3, 59.) He is diagnosed with Down Syndrome and has a history of developmental delays, asthma, and strabismus in his eyes. (Id. ¶ 4.) His Down Syndrome causes him to suffer from severely impaired speech. (Id. ¶ 5.) Because of his impaired speech, J.G. can verbalize only a few words. (Id.) Since approximately 2016, J.G. has used a tablet device to help him communicate at home. (Exhibit C at 214:21-215:1.)

### B. Plaintiff Attends Lowman Special Education Center

From 2015 to 2019 and the ninth to twelfth grade, J.G. was a student a Lowman Special Education Center ("Lowman"), a District-run school for children with disabilities. (Id. ¶ 11.) In ninth and twelfth grade, J.G. was in a class taught by Lynne Cripe. (Id. ¶ 12.) In tenth and eleventh grade, J.G. was in Sally Weinberger's special day class for students with severe disabilities. (Id. ¶ 13.)

Weinberger testified that during his time at Lowman, J.G. required accommodations like verbal and physical prompting, "modeling, gestures, even [] some signs," "high interest learning materials," and "reteaching[.]" (Exhibit E at 163:13-23.) Weinberger testified that while J.G. "required a lot," "with dedication from the teacher… [his modifications] could probably be implemented[]"and he "could be successful" in a general education campus. (Id. at 164:3-10.) Cripe testified that she did not believe that J.G. needed a "one-to-one aide"[7] to participate in

[6] Plaintiff's statement of undisputed facts sometimes cites deposition testimony or other evidence not filed with the Motion. (See, e.g., PSUF ¶¶ 42, 49-50, 52.) The Court considers any such facts disputed to the extent Defendant disputes them and other evidence does not support the stated fact. The Court ADMONISHES Plaintiff's counsel and urges them to take greater care in future filings.

[7] A "one-to-one aide," as several witnesses use the term, appears to mean an assistant who is "right there by [J.G.'s] side" to assist him with his educational needs. (Exhibit E at 123:16-21.)

class because of the other support available to him and his improved behavior. (Exhibit E at 235:19-236:10.) Lauren Foster, who later served as J.G.'s teacher in a general education campus, testified that J.G. did not require a one-to-one aide because his communication device and other staff support adequately provided him necessary supervision. (Id. at 122:11-123:18.)

Maria Zaragoza was a school psychologist for J.G. at Lowman from 2012 to 2019. (Exhibit D at 10:18-19, 13:8-14.) She testified that she had never conducted a psychoeducational evaluation for J.G. (Id. at 31:22-33:2.) J.G.'s mother testified that to her understanding, from 2007 to 2019, her son was not provided a psychoeducational evaluation and the District never conducted a meeting to reevaluate him after his initial evaluation. (Martha Declaration ¶¶ 12-16.) Dr. Carlos Flores, a psychologist who conducted an independent psychoeducational evaluation of J.G. in 2019, testified that he could not find any prior psychoeducational evaluations in J.G.'s records. (Exhibit D at 126:15-23.)

Despite his lack of psychoeducational evaluations at Lowman, J.G. received a number of other evaluations over his time at Lowman, including: (1) evaluations by teachers and speech pathologists in the area of speech, language, and augmentative and alternative communication (DSUF ¶ 81); (2) an assessment for speech and language (id. ¶ 88); (3) assessments for adapted physical education (id. ¶¶ 89-90); and (4) an academic performance assessment in 2018 (id. ¶ 91; Exhibit 4).

**C. February to June of 2017: Fenig Meets with J.G.'s Mother**

Marshall Fenig was a speech language pathologist ("SLP") employed by the District who worked with J.G. and provided him with speech therapy during his time at Lowman. (PSUF ¶¶ 31-32.) At some point between February and June of 2017, Fenig met twice with J.G.'s mother. (Exhibit G at 227:3-228:5.) At the meetings, J.G.'s mother requested that J.G. be permitted to use his personal tablet device at school to assist with his communication. (Id.; Exhibit F at 87:1-88:25.) After the first meeting, Fenig decided that J.G. would instead use an alternative and school-provided device to communicate. (Exhibit F at 87:1-88:25.) About a month and a half later, J.G.'s mother met with Fenig a second time. (Id.) J.G.'s mother reiterated her desire for J.G. to use his personal tablet to communicate and stated that the alternative device was insufficient because "[i]t was too big, and [J.G.] couldn't take it outside[.]" (Id. at 88:16-25.) Fenig declined because "of liability issues and [] programming issues" in addition to a concern that the personal tablet "may not [have] be[en] the appropriate system" for J.G. (Exhibit C at 74:6-17.)

//
//
//
//
//
//
//

//

**D. May 30, 2019: IEP[8] Meeting**

Cripe testified that during a May 30, 2019 IEP meeting, the IEP team considered J.G.'s parent's request to move J.G. from Lowman to a general education classroom setting at Sun Valley High School ("Sun Valley"). (Exhibit E at 225:23-226:9.) Sun Valley is a comprehensive high school that offers general education classes. (PSUF ¶ 26.) According to Cripe, there was no discussion amongst the IEP team about whether J.G. would have difficulty transferring the accommodations, modifications, and support that he had received at Lowman to Sun Valley. (Exhibit E at 231:12-17.) Cripe did not express disagreement with the plan to place J.G. in a general education classroom setting. (Id. at 225:19-22.) Ultimately, the IEP team determined that while J.G. would participate in a June 2019 graduation ceremony with his peers from Lowman, he would begin the 2019-2020 school year in the moderate intellectual disability class at Sun Valley. (Exhibit B at 41.)

**E. Plaintiff Attends Sun Valley High School**

J.G. completed his move to Sun Valley at the beginning of the 2019-2020 school year. (PSUF ¶ 26.) While at Sun Valley, he attended a class for students with moderate intellectual disabilities taught by Foster. (Id. ¶ 27.) He also attended a general education class taught by Jamal Speakes. (PSUF ¶ 30.) Speakes testified that J.G's performance in class was "about the same" as other students in his class with disabilities. (Id.; Exhibit D at 295:1-295:4.) While at Sun Valley, J.G. has used his personal tablet device from home to communicate with others. (PSUF ¶ 43.)

**F. The IDEA Due Process Hearing**

On August 16, 2019, J.G.'s parents filed a due process hearing request in the OAH and named the District as a defendant. (Exhibit B at 22.) The OAH assessed multiple issues, including whether the District deprived J.G. of a free and adequate public education ("FAPE") by failing to place him in the least restrictive learning environment ("LRE") from May 16, 2018 to June 7, 2019. (Id. at 23.) The case was assigned to administrative law judge ("ALJ") Alexa J. Hohensee, who held a hearing on the matter on October 8, 9, and 10, 2019. (Id.)

Among other rulings, ALJ Hohensee found that "none of the [District] witnesses []… were surprise[d] that [J.G.] appeared to be doing well at Sun Valley [High School]. [J.G.'s] skills

---

[8] "IEP" is an acronym for an independent educational plan. In perhaps overly simplified terms, IEPs are teaching plans required under the Individuals with Disability Education Act ("IDEA") and formulated by school districts to provide disabled children with meaningful public education suited to their needs. See 20 U.S.C. §§ 1400–1482. J.G.'s IEP "team" consisted of multiple teachers, speech pathologists, psychologists, and his mother, each of whom would meet regularly to form a plan to provide him adequate education services.

were generally at the same level as other students in [the]… intellectual disabilities class, and he was friendly and well-behaved." (Id. at 54.) As a result, the ALJ held that in the context of the IDEA, "[p]lacement at Lowman did not provide [J.G.] with opportunities to engage in activities with nondisabled students to the maximum extent that was appropriate in light of the continuum of program options. Accordingly, Lowman was not the least restrictive environment for [J.G.]… from February 19, 2019 through May 30, 2019." (Id. at 55.)

Despite those findings, the OAH also found that J.G.'s placement at Lowman was approved by J.G.'s parents in a settlement agreement entered into on May 15, 2018 and covering a period of time from February 29, 2018 to February 19, 2019. (Id. at 53.) The ALJ thus held that J.G. could not challenge the restrictiveness of his learning environment from February 29, 2018 to February 19, 2019 because his parents had waived his right to a FAPE and the OAH lacked jurisdiction to set aside the settlement. (Id.) ALJ Hohensee further concluded that despite failing to place J.G. in the least restrictive learning environment from February 19, 2019 through May 30, 2019, "the evidence did not establish that the three-month [period]… resulted in a loss of educational opportunity[]" for J.G. (Id. at 59.)

## V. DISCUSSION

Plaintiff moves the Court to enter summary judgment on his ADA and Section 504 claims. (See Motion.) In particular, Plaintiff seeks summary judgment on four theories of liability alleged in the FAC: (1) that Plaintiff's placement in Lowman was not the most integrated setting appropriate to his needs from 2015 to 2019; (2) that the District failed to provide Plaintiff a reasonable accommodation by refusing to allow him to use his personal tablet device at Lowman between February 2017 to June 2018; (3) that the District failed to properly reevaluate J.G. from 2007 to 2019; and (4) that the District committed each aforementioned violation with deliberate indifference. (Id.) The Court addresses all four claims below.

### A. Unlawful Segregation

#### 1. Collateral Estoppel: February 19, 2019 through May 30, 2019

First, Plaintiff moves the Court for entry of summary judgment on his claim that he was unlawfully segregated on the basis of disability from 2015 to 2019. (Memo at 19.) Plaintiff argues that the doctrine of collateral estoppel establishes facts that warrant partial summary judgment of his unlawful segregation theory. (Id. at 17.) Plaintiff urges the Court that ALJ Hohensee's findings of fact in Plaintiff's administrative due process hearing necessarily decided at least one issue before the Court: whether Plaintiff was unlawfully segregated on the basis of disability from February 19, 2019 to May 30, 2019. (Id. at 18–19.) The Court agrees.

The doctrine of collateral estoppel "applies to a question, issue, or fact when four conditions are met: (1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." Oyeniran v. Holder,

672 F.3d 800, 806 (9th Cir. 2012) (citing Montana v. United States, 440 U.S. 147, 153–54 (1979)). "Once an issue is actually litigated, the court's determination is conclusive in subsequent suits based on different causes of action." Islam v. U.S. Dep't of Homeland Sec., 136 F. Supp. 3d 1088, 1091 (N.D. Cal. 2015). Application of collateral estoppel enforces the axiomatic principle that "a losing litigant deserves no rematch after a defeat fairly suffered[]… on an issue identical in substance to the one he subsequently seeks to raise." Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 107 (1991). "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." Id. "The principle holds true when a court has resolved an issue, and should do so equally when the issue has been decided by an administrative agency, be it state or federal[]… which acts in a judicial capacity." Id. at 108. (internal citations omitted).

Here, ALJ Hohensee conducted an OAH due process hearing in October of 2019 and made several findings of fact with regard to the adequacy of Plaintiff's placement at Lowman. (See generally Exhibit B.) In the context of the IDEA, the ALJ held that "[p]lacement at Lowman did not provide [J.G.] with opportunities to engage in activities with nondisabled students to the maximum extent that was appropriate in light of the continuum of program options. Accordingly, Lowman was not the least restrictive environment for [J.G.]… from February 19, 2019 through May 30, 2019." (Id. at 55.) The OAH is an administrative agency and ALJ Hohensee's findings were clearly made in a judicial capacity to resolve disputed issues. (See generally Exhibit B; see also OAH Complaint.) Defendant further does not dispute that ALJ Hohensee's ruling was "necessary to decide the merits," that the issue at stake in the hearing was "actually litigated and decided," and that "there was a full and fair opportunity to litigate the issue[.]" Oyeniran, 672 F.3d at 806.

Instead, the only element of collateral estoppel disputed by Defendant is the second element — whether the relevant issue "was identical in both proceedings[.]" Id. Defendant first argues that Plaintiff seeks summary judgment on a period of time stretching from 2015 to 2019, while ALJ Hohensee only ruled on the restrictiveness of J.G.'s learning environment from February 19, 2019 through May 30, 2019. (Opposition at 20.) However, Defendant's argument incorrectly assumes that the Court cannot limit summary judgment on Plaintiff's claims to the relevant three month period. Because the Court limits its collateral estoppel analysis to the period of time between February 19, 2019 to May 30, 2019, the issue at stake retains identity with the issue addressed by the ALJ.

Defendant also appears to contend that ALJ Hohensee's finding that Lowman was not the "least restrictive environment" under the IDEA is not relevant or applicable to Plaintiff's claims under the ADA and Section 504. (Opposition at 20.) But regardless of what claim was litigated in a prior proceeding, a party is precluded from further litigation of an issue if that issue "was necessarily decided in [the] prior proceeding[.]" In re Harmon, 250 F.3d 1240, 1248 (9th Cir. 2001); see also Islam, 136 F. Supp. 3d at 1091 ("Once an issue is actually litigated, the court's determination is conclusive in subsequent suits based on different causes of action.") (emphasis added).

In the due process hearing, the OAH ruled on issues relevant to Plaintiff's claims under the IDEA. In order to determine the merits of Plaintiff's IDEA claim, the OAH was required to assess whether J.G. was placed in the least restrictive learning environment from February to May of 2019 — or whether J.G. could have been instructed and integrated in a general public school during that time. The OAH held that Lowman was not the LRE for J.G. because "Lowman did not provide [J.G.] with opportunities to engage in activities with nondisabled students to the maximum extent that was appropriate[.]" (Exhibit B at 55.) In other words, by holding that Lowman was not the LRE for J.G., the OAH "necessarily decided" the relevant issue under Section 504 and the ADA: whether the District administered J.G. education in the "most integrated setting appropriate" from February to May of 2019.[9] See Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 591–92 (1999)(explaining that that regulations enforcing the ADA and Section 504 require public entities to "administer programs and activities in the most integrated setting appropriate" for disabled children and holding that "the most integrated setting appropriate" is "a setting the enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible") (internal quotations omitted).[10] Thus, despite the different legal context in which it was made, ALJ Hohensee's finding applies with equal force to Plaintiff's Section 504 and ADA claims.

Finally, Defendant argues that ALJ Hohensee made findings of fact that favor Defendant and ultimately ruled against Plaintiff on his IDEA claim. (Opposition at 21.) That much is true. However, the issues referenced by Defendant and ruled on favorably by the OAH are not identical to the issues in this matter, which concern new theories of liability premised on issues unaddressed by ALJ Hohensee. For example, the ALJ ruled that the District reasonably accommodated J.G. with alternative communication equipment that sufficiently provided J.G. educational benefits under the IDEA during the 2018-2019 school year. (Exhibit B at 68–69.) The issue in this matter, however, is whether J.G. was reasonably accommodated with an adequate communication device from February of 2017 to June of 2018. (Memo at 8.) Likewise, the OAH rejected Plaintiff's claim that he was denied reasonable accommodations because the District failed to provide him with a communication device for home use during the summer of 2019 — a theory of liability Plaintiff has not alleged in this matter. (See generally FAC; see generally Memo.) Consequently, none of the other rulings and findings in the OAH pertain to issues relevant to the Motion.

The OAH necessarily determined that J.G. was not integrated to the maximum extent appropriate from February 19, 2019 to May 30, 2019. Moreover, as detailed below, a school district's failure to fully integrate a disabled student constitutes discrimination on the basis of

---

[9] The Court discusses the relevant standard under Section 504 and the ADA more thoroughly below. See infra Part V.A.2.

[10] Defendant contends that Olmstead is "not on point[]" because it involved "two female adults" with mental illness "placed in state [] health care facilities, not schools." (Opposition at 18.) Defendant fails to explain why such factual distinctions impact the Supreme Court's articulation of the relevant legal standard under the ADA and Section 504.

disability under the ADA and Section 504. Accordingly, the Court GRANTS the Motion to the extent it seeks summary judgment on Plaintiff's unlawful segregation claim from February 19, 2019 through May 30, 2019.

**2. Unlawful Segregation Prior to February 19, 2019**

Next, the Court examines whether the District violated the ADA and Section 504 by failing to place J.G. in a general education campus from 2015 until February 19, 2019. To prevail on an ADA claim, Plaintiff must establish that "(1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." Weinreich v. Los Angeles Cty. Metro. Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997) (emphasis removed) (internal quotations omitted). "Similarly, under Section 504 of the Rehabilitation Act, a plaintiff must show: (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability*;* and (4) the program receives federal financial assistance." Id. (emphasis removed) (internal quotations and citations omitted). The parties disagree only on whether J.G. was discriminated against or denied benefits by reason of his disability.

Section 504 and the ADA prohibit public entities receiving federal funds from discriminating against or excluding individuals on the basis of disability. See 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States[]… shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"); see also 42 U.S.C. § 12132 ("No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."). Statutes and regulations clarifying both acts describe unjustified segregation of an individual with disabilities from a setting with non-disabled individuals as a form of discrimination.

For example, the ADA preamble expressly defines unjustified segregation as a form discrimination. See 42 U.S.C. § 12101(5) ("[I]ndividuals with disabilities continually encounter various forms of discrimination, including… segregation[.]"); see also Olmstead, 527 U.S. at 600 ("[I]n findings applicable to the entire [ADA], Congress explicitly identified unjustified segregation of persons with disabilities as a for[m] of discrimination.") (internal quotations omitted). Regulations further specify with regards to segregation that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Likewise, regulations promulgated pursuant to the Rehabilitation Act prohibit school districts from "[p]rovid[ing] different or separate aid, benefits, or services to handicapped persons… unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others[.]" 34 C.F.R. § 104.4(b)(iv).

Here, the Court finds that there is a triable issue as to whether J.G.'s placement at Lowman from 2015 to February 19, 2019 provided the "most integrated setting appropriate" or was otherwise "necessary" to provide him with effective education services. 28 C.F.R. § 35.130(d); 34 C.F.R. § 104.4(b)(iv). On the one hand, Weinberger testified that "with dedication from the teacher… [J.G.'s required modifications] could probably be implemented[]"and he "could be successful" in a general education campus. (Exhibit E at 164:3-10.) Likewise, neither Weinberger nor any other member of J.G.'s IEP team expressed surprise over J.G.'s success when he transferred to Sun Valley in August of 2019. (PSUF ¶ 18.) On the other hand, it is unclear what period of time Weinberger was referring to when she stated that J.G. "could [have] be[en] successful" in a general education setting and whether her opinion related to J.G.'s education as far back as 2015.[11] Moreover, Weinberger also testified that she participated in J.G.'s 2017 and 2018 IEPs, in which the IEP team agreed that Lowman "was the appropriate setting[]" for him. (Weinberger Declaration ¶ 5.)

Similarly, Cripe testified that during J.G.'s May 30, 2019 IEP meeting, the IEP team did not discuss whether transferring J.G.'s accommodations and modifications to Sun Valley would be too difficult. (Exhibit E at 231:12-17.) Cripe also did not express disagreement with the plan to place J.G. in Sun Valley. (Id. at 225:19-22.) However, to whatever extent such evidence suggests that J.G. was no longer integrated to the "maximum extent appropriate" in May of 2019, the testimony fails to suggest when J.G. first became insufficiently integrated — let alone whether he was not integrated to the "maximum extent appropriate" as early as 2015. In fact, Cripe testified that prior to 2019 she and IEP team members had concluded that J.G.'s placement at Lowman was the most appropriate setting for him. (Cripe Declaration ¶¶ 5-6.) Therefore, the Court finds that a reasonable trier of fact could find that J.G. was integrated to the maximum extent appropriate from 2015 to February 19, 2019. The Motion is DENIED as to that time period.

**B. Failure to Provide Effective Communication Device**

Second, Plaintiff moves the Court to enter summary judgment on his claim that the District failed to offer him meaningful access to the benefits of public education by failing to provide him with an effective communication device from February of 2017 to June of 2018. (Motion at 22.) The ADA and Section 504 require public entities to provide reasonable accommodations to persons with disabilities to ensure that no disabled individual is denied services or otherwise treated differently on the basis of disability. K.M. ex rel. Bright v. Tustin Unified Sch. Dist., 725 F.3d 1088, 1096 (9th Cir. 2013) (citing 42 U.S.C. §§ 12132, 12134); see also Payan v. Los Angeles Cmty. Coll. Dist., 2018 WL 6164269, at *14 (C.D. Cal. Oct. 16, 2018) ("In the context of [the ADA] — and, by extension, Section 504 — discrimination can be found where the public entity fail[s] to reasonably accommodate a person's disability."). To establish liability under the ADA and Section 504, Plaintiff must prove that he was denied a reasonable

[11] Indeed, Cripe, not Weinberger, was J.G.'s instructor for the 2015-2016 school year. (PSUF ¶¶ 12-13.) Weinberger thus could not have personal knowledge of J.G.'s fitness for placement in a general education campus prior to the 2016-2017 school year.

accommodation necessary for him to enjoy "meaningful access" to the benefits of the District's education services. K.M., 725 F.3d at 1102 (applying "meaningful access" standard to determine reasonable accommodation in ADA case); see also Mark H. v. Hamamoto, 620 F.3d 1090, 1097 (9th Cir. 2010) (applying "meaningful access" standard to determine reasonable accommodation under Section 504).

Relatedly, relevant regulations mandate that public entities reasonably accommodate disabled individuals by "tak[ing] appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). Among other requirements, section 35.160 requires public entities to "furnish appropriate auxiliary aids… where necessary to afford individuals with disabilities[]… an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." Id. § 35.160(b)(1). The regulation goes on to specify regarding auxiliary aids that:

> "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability."

Id. § 35.160(b)(2). The reasonableness of an accommodation provided to ensure effective communication "depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to [enjoy meaningful access to the program.]" Hamamoto, 620 F.3d at 1098 (internal quotations omitted).

Applying law to fact, a triable issue exists as to whether the District failed to reasonably accommodate J.G. with a communication device and thus denied him "meaningful access" to public education. The evidence indicates that J.G.'s Down Syndrome causes him to have difficulty speaking or verbalizing. (PSUF ¶ 5.) To assist with communication and accommodate his disability, the District provided J.G. with a variety of augmentative and alternative communication devices in the classroom beginning in the 2015-2016 school year. (Exhibit B at 26.) Since approximately 2016, J.G. has utilized a personal tablet device at home to communicate with his family. (Exhibit C at 214:21-215:1.)

At some point between February and June of 2017, J.G.'s mother met with Fenig — the District's speech pathologist — and J.G.'s other IEP team members to express that she preferred for J.G. to use his personal tablet device from home for communication at Lowman. (Exhibit G at 227:3-228:5; Exhibit F at 87:1-88:25.) Despite her wishes, Fenig maintained J.G.'s use of the alternative communication devices issued by the District. (Exhibit F at 87:1-88:25.)

In a second meeting with Fenig, J.G.'s mother reiterated her desire for J.G. to use his personal tablet device for communication at Lowman. (Id. at 88:16-25.) She expressed that the alternative device was not the most effective device for J.G. because "[i]t was too big, and [J.G.] couldn't take it outside[.]" (Id.) She also expressed a desire for J.G. to have "consistency" with his mode of communication. (Exhibit B at 29.) Fenig and the District denied J.G. use of his personal tablet device because "of liability issues and [] programming issues" in addition to a concern that the personal tablet "may not [have] be[en] the appropriate system" for J.G. (Exhibit C at 74:6-17.) As to the latter concern, Fenig and IEP team members believed that the alternative devices provided to J.G. were better for language acquisition, could be more easily programmed to activities in the classroom, and were more appropriate to accessing the curriculum. (Exhibit B at 29.)

In all, the evidence could lead a reasonable trier of fact to find that the alternative communication devices provided to J.G. by the District offered him meaningful access to public education. While some evidence indicates that J.G.'s mother preferred that he use his personal tablet device for consistency and accessibility, other evidence suggests that the alternative communication devices provided by the District were better suited for improving J.G.'s language skills and involving him in the classroom.[12] Moreover, Plaintiff has not submitted evidence that differences in access or consistency between the alternative devices and J.G.'s personal device deprived him of meaningful access to public education. Thus, whether the District failed to reasonably accommodate J.G. by refusing to permit him to use his personal tablet device at Lowman is a triable issue. The Motion is DENIED as to that theory.

**C. Failure to Reevaluate**

Plaintiff moves the Court to enter summary judgment on his third and final theory of liability. (Memo at 25.) Plaintiff argues that the District failed to provide "meaningful access" to public education by failing to conduct psychoeducational reevaluations of J.G. from 2007-2019 to ensure that his placement at Lowman complied with the ADA and Section 504. (Id.) In response, the District contends that it conducted periodic physical, academic, and linguistic evaluations of J.G. that are sufficient to raise a triable issue as to its obligations under Section 504 and the ADA. (Opposition at 23.) The Court finds that the evidence does not warrant summary judgment as to Plaintiff's final theory of liability.

---

[12] Plaintiff places great emphasis on the regulatory requirement that public entities providing auxiliary aids or services give "primary consideration to the requests of individuals with disabilities." 28 C.F.R. § 35.160(b)(2). However, Plaintiff fails to introduce evidence that J.G. — as opposed to his mother — prefers the use of his personal tablet device to communicate. Regardless, even if J.G.'s mother's preference was synonymous with J.G.'s preference, the question of whether the District's alternative devices were sufficiently reasonable accommodations remains a triable issue because the request of a disabled individual is given primary and not dispositive weight by the relevant regulation. Id.

The ADA and Section 504 require school districts to conduct evaluations of students with disabilities to ensure proper placement and adequate provision of special education services. See generally 20 U.S.C. § 1414; see also 34 C.F.R. §§ 300.303–304.[13] In addition to conducting an initial evaluation to determine if a student requires disability services, school districts must conduct "triennial reevaluations," or evaluations conducted "at least once every 3 years, unless the parent and the local educational agency agree that reevaluation is unnecessary." 20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. § 300.303(b)(2). As to the form and content of the reevaluations, the school district must "(1) [u]se a variety of assessment tools and strategies to gather relevant functional developmental, and academic information about the child…; (2) not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child; and (3) [u]se technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." 34 C.F.R. §§ 300.304(b)(1)–(3). Additionally, a school district must ensure that "[t]he child is assessed in all areas related to the suspected disability, including, if appropriate, health,

[13] Plaintiff appears to assume that the regulation at issue is 34 C.F.R. § 104.35. (Memo at 26.) Not so. Section 104.35 requires school districts to "establish standards and procedures" to evaluate and reevaluate disabled students. 34 C.F.R. § 104.35(b). By Plaintiff's own admission, the District established evaluation standards and procedures that existed during J.G.'s time at Lowman. (See PSUF ¶¶ 33, 56.) Instead, sections 300.303 and 300.304 provide the relevant regulations because they impose substantive requirements on the evaluations of disabled students — as opposed to requirements on the content of evaluation policies.

Moreover, the Court notes that the parties failed to adequately brief the private enforceability of many of the cited regulations. "[A] plaintiff may establish denial of 'meaningful access' under section 504 and Title II by showing there was a violation of one of the regulations implementing [the statutes], if such violation denied the plaintiff meaningful access to a public benefit." A.G. v. Paradise Valley Unified Sch. Dist. No. 69, 815 F.3d 1195, 1204 (9th Cir. 2016). However, to enforce a regulation through a private right of action, "the regulation must be an 'implementing regulation' within the meaning of Alexander v. Sandoval, 532 U.S. 275, 121 [] (2001)." Id. (internal citations omitted) (citing Hamamoto, 513 F.3d at 935). The Ninth Circuit has previously treated the auxiliary aid requirements under section 35.160 as an implementing regulation, although without conducting a full Sandoval analysis. See Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1136 (9th Cir. 2001) (citing and relying on 28 C.F.R. § 35.160(b)(1) for the applicable standard). In his brief, Plaintiff limits his Sandoval analysis to section 104.35, which is not relevant to his claims. (See Memo at 26 (citing 34 C.F.R. § 104.35 and Mark H. v. Lemahieu, 513 F.3d 922, 938 n.14 (9th Cir. 2008)).) Defendant altogether fails to address the private enforceability of the cited regulations. Because the evidence raises triable issues as to Plaintiff's reevaluation claim even if the cited regulations are privately enforceable, and because both parties failed to fully brief the issue, the Court does not address whether the cited regulations are implementing regulations under Sandoval.

vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities" and ensure that "the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs[.]"[14] 34 C.F.R. § 300.304(c)(4); id. § 300.304(c)(6).

The Court finds that triable issues exist as to whether the District sufficiently reevaluated J.G. throughout his years at Lowman. While Plaintiff has submitted evidence that suggests J.G. did not receive psychoeducational evaluations prior to 2019 (Exhibit D at 126:15-23), Defendant has submitted evidence that Plaintiff was periodically reevaluated in a broad array of categories related to his disability (DSUF ¶¶ 81–83, 88–91). Moreover, the evidence suggests that Boyajian, Fenig, Weinberger, and Cripe conducted weekly and daily evaluations of J.G. throughout his time at Lowman, with Boyajian testifying that J.G.'s file included documentation of triennial evaluations.[15] (Boyajian Declaration ¶¶ 6–7; Fenig Declaration ¶¶ 4–6; Weinberger Declaration ¶¶ 4–7; Cripe Declaration ¶¶ 4–5.) Plaintiff contends that these evaluations were insufficiently comprehensive under the relevant regulations. (Reply at 14.) However, whether the content of the evaluations was sufficiently comprehensive is a fact-intensive inquiry ill-suited for summary judgment. In any event, Plaintiff has failed to rebut Defendant's evidence with proof that the evaluations failed to assess J.G. "in all areas related to [his]… disability" or were not "sufficiently comprehensive" to identify his needs. Because Plaintiff bears the burden of proof, the Motion is DENIED.[16]

**D. Deliberate Indifference**

Finally, Plaintiff moves for summary judgment on the issue of deliberate indifference. To recover monetary damages under the ADA or Section 504, a plaintiff must establish either (1) intentional discrimination or (2) deliberate indifference to their rights on the part of the defendant. See Duvall, 260 F.3d at 1138. "Deliberate indifference requires both [1] knowledge

---

[14] The regulations impose several other requirements on the content of evaluations, but none are relevant to the Motion. See generally 34 C.F.R. § 300.304(c).

[15] As to the daily and weekly evaluations, Plaintiff points out the ADA's admonition that "'screening of a student to determine appropriate instructional strategies for curriculum implementation shall not be considered to be an evaluation for eligibility for special education and related services.'" (Reply at 14 (quoting 20 U.S.C. § 1414(a)(1)(E).) Yet despite that provision, the evidence suggests that District employees utilized J.G.'s daily and weekly evaluations to broadly assess his overall progress and needs — not solely to develop instructional strategies for his curriculum. (Weinberger Declaration ¶ 4; Cripe Declaration ¶¶ 4–5.) Thus, whether the regular evaluations conducted by the District qualify as "screening[s]… to determine appropriate instructional strategies for curriculum implementation" remains a triable issue. 20 U.S.C. § 1414(a)(1)(E).

[16] Because the Court denies the Motion on other grounds, it need not and does not decide whether the relevant statutes of limitations raise triable issues as to Plaintiff's claims dating back to 2007 and 2015. (Opposition at 14.)

that a harm to a federally protected right is substantially likely, and [2] a failure to act upon that the likelihood." Id. at 1139. As to the first prong, a plaintiff must establish that he "'alerted the public entity to [her] need for accommodation;' or that 'the need for accommodation [was] obvious, or required by statute or regulation.'" A.G., 815 F.3d at 1207 (quoting Duvall, 260 F.3d at 1139). "[I]n order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness." Duvall, 260 F.3d at 1139. Where, like here, a plaintiff sues under the ADA and Section 504 and names a municipal or county entity as defendant, the entity is vicariously liable for the deliberate indifference of its employees. Id. at 1141.

Here, Plaintiff cannot establish that the District was deliberately indifferent as a matter of law. As the District points out, Plaintiff submits no evidence that its employees deliberately ignored or deliberately failed to act in response to Plaintiff's recognized needs for reasonable accommodations. For his part, Plaintiff fleetingly argues that the District's "violation of the clear mandates of the [relevant] regulations[] constitutes deliberate indifference as a matter of law." (Reply at 15.) Plaintiff misconstrues the deliberate indifference standard. To be sure, the first element of deliberate indifference can be satisfied if the right violated is "required by statute or regulation." A.G., 815 F.3d at 1207 (internal quotations omitted). But as detailed above, triable issues exist as to whether the District has violated the applicable regulations. Moreover, even in the case of Plaintiff's partially-meritorious unlawful segregation claim, determining whether the District was deliberately indifferent requires a second inquiry: assessing whether the District's "failure to act… [was] more than negligent, and involve[d] an element of deliberateness[.]" Duvall, 260 F.3d at 1139. Plaintiff has not pointed to evidence that the District deliberately failed to integrate him to the maximum extent possible from February 19, 2019 to May 30, 2019. Thus, the Court DENIES Plaintiff's Motion to the extent it seeks summary judgment on the issue of deliberate indifference.[17]

//
//
//

---

[17] In the Motion, Plaintiff alternatively requests that the Court make specific factual findings to streamline resolution of certain issues at trial. (Motion at 2–4.) Many of the issues specified by Plaintiff have already been addressed and found to be disputed in this Order. As to remaining issues not addressed, the Court exercises its discretion to try the issues because (1) the remaining issues could be further illuminated by evidence not submitted with the Motion; and (2) a Rule 56(g) order on those issues would not materially expedite trial. See S.E.C. v. Retail Pro, Inc., 2011 WL 589828, at *3 (S.D. Cal. Feb. 10, 2011) ("'Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established. The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.'") (quoting Fed. R. Civ. P. 56(g) advisory committee's cmt. (2010 amd.)). The alternative request is DENIED.

## VI. CONCLUSION

For the reasons described above, the Court GRANTS-IN-PART and DENIES-IN-PART the Motion. The Court GRANTS the Motion as to Plaintiff's ADA and Section 504 claims to the extent they allege his unlawful segregation from February 19, 2019 to May 30, 2019. The Motion is DENIED as to all other theories of liability.

**IT IS SO ORDERED.**