1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7                   CENTRAL DISTRICT OF CALIFORNIA
8
9   J.G., a minor by and through his            Case No. 2:19-cv-01268-JGB-E
    Guardians ad Litem, Jose G. and Martha F.,
10
                                    Plaintiff,
11                                               **FINDINGS OF FACT AND**
           v.                                    **CONCLUSIONS OF LAW**
12
    Los Angeles Unified School District,
13
                                   Defendant.
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff J.G., by and through his Guardians ad Litem, Jose G. and Martha F., brought this action against Defendant Los Angeles Unified School District, alleging (1) violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.; and (2) violations of Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, et seq.

The case was tried to the Court without a jury on November 2, 3, 4, and 5, 2021.  In lieu of closing arguments, the Court ordered closing briefing.  Defendant filed its closing brief on May 5, 2022.  ("Def. Closing," Dkt. No. 133.)  Plaintiff filed his closing brief on May 9, 2022.  ("Pl. Closing," Dkt. No. 135.)  Defendant filed its opposition to Plaintiff's closing brief on May 23, 2022.  ("Def. Opp.," Dkt. No. 141.)  Plaintiff filed his reply to Defendant's closing brief on May 23, 2022. ("Pl. Reply," Dkt. No. 142.)

The Court, having considered all the evidence presented by the parties, the written submissions from both sides, and the argument of counsel, issues the following Findings of Fact and Conclusions of Law.

# I.   FINDINGS OF FACT

## A.  General Facts

1. Javier Guerrero ("J.G.") was born on September 28, 2001.  ("Stip. Facts," Dkt. No. 144, 6B.)

2. J.G. has Down syndrome and is a person with a disability.  (Id. 5B, 6A.)  As a result of his Down syndrome, J.G. has severe speech and language impairments, as well as cognitive impairments.  (Id. 6D.)

3. At all relevant times, J.G. attended public schools in the Los Angeles Unified School District (the "District") and received special education services.  (Id. 6C, 6E.)

## B.  Least Restrictive Environment

4. From 2004 to 2019, J.G. attended Lowman Special Education Center ("Lowman").  (Id. 5A.)

5. J.G. received an Individualized Education Program ("IEP") every year.  ("Def. Facts," Dkt. No. 133-1, ¶ 4.)  J.G.'s mother, Martha F., was part of his IEP team and attended all of the IEP meetings with a Spanish translator.  (Id. ¶ 5.)  J.G.'s mother testified that she usually signed the IEPs on the day of the meetings, though she would receive a translated written copy of the IEPs months later.  (M. Flores Testimony 53:16–25 [Day 2].)

6. The District's Policy Bulletin 5901.4, "Determining the Appropriate Educational Placement for Students with Disabilities in the Least Restrictive Environment (LRE)," dated May 15, 2017, states: "It is the policy of the District that students with disabilities receive all supplementary aids, services and placements, as determined by an individualized education program (IEP) team, in the least restrictive environment.  The general education classroom with all appropriate supplementary aids and services is the first educational setting that the IEP team must consider."  (Trial Ex. 28.)  "The extent to which students with disabilities are integrated with

their nondisabled peers positively impacts their educational achievement and their social growth."  (Id.)

7. At the June 8, 2006 IEP meeting, the IEP team offered to place J.G. on a general education campus.  ("Pl. Facts," Dkt. No. 135-1, ¶ 19.)  J.G. attended Montague Street Elementary, a general education campus, for a few months.  At the September 26, 2006 IEP meeting, "Mom reported that Javier has regressed from June to September.  The change in schools and routine was apparently too drastic and it has not met his needs. . . . She wanted him to return to Lowman."  (Trial Ex. 5 at 17.)  J.G. returned to Lowman.  (Pl. Facts ¶ 20; Def. Facts ¶ 8.)

8. On September 21, 2007, J.G.'s pediatrician wrote a letter to Lowman stating, "His mother is very interested, as am I, in Javier attending school with more functional kids."  (Pl. Facts ¶ 22; Trial Ex. 7.)

9. At the September 26, 2007 IEP meeting, J.G.'s mother expressed, "I want my son Javier go to regular school."  (Pl. Facts ¶ 23; Trial Ex. 8 at 40.)  At the same meeting, the IEP team "agree[d] that Javier should be in a special day class on a general education campus."  (Pl. Facts ¶ 24; Trial Ex. 8 at 37.)

10. However, J.G.'s mother did not know that the IEP team offered to place J.G. on a general education campus.  (Pl. Facts ¶¶ 25, 27.)

11. J.G. remained at Lowman until 2019.  (Id. ¶ 28.)

12. Lynne Cripe is a teacher at Lowman who taught J.G. for the 2015–2016 (ninth grade) and 2018–2019 (twelfth grade) school years.  (Stip. Facts 6K.)

13. In 2015, J.G.'s accommodations, modifications, and supports included "individual and/or small group instruction, extended wait time for response, frequent verbal/physical reminders and/or prompts to stay on task, and high interest materials."  (Trial Ex. 23 at 32.)  Ms. Cripe testified that although these accommodations could have been provided on a general education

4

campus, she believed that Lowman was the least restrictive environment for J.G. for the ninth grade.  (L. Cripe Testimony 118:20–22, 131:3–6.)

14. Sally Weinberger was a teacher at Lowman who taught J.G. for the 2016–2017 (tenth grade) and 2017–2018 (eleventh grade) school years. (Stip. Facts 6J.)

15. Ms. Weinberg testified that J.G. required accommodations such as "verbal prompting, physical prompting, modeling, reteaching, individualized instruction, extended wait time, redirection," and "high interest learning materials."  (S. Weinberger Testimony 50:1–9.)  She believed that "given those accommodations, he can succeed anywhere."  (Id. 51:2–3.)

16. As J.G.'s teachers, Ms. Cripe and Ms. Weinberger assessed and evaluated J.G.'s educational progress on a daily and weekly basis.  (Id. ¶¶ 22, 29.) Ms. Cripe and Ms. Weinberger also provided annual written assessments of J.G.'s performance in areas such as functional reading, functional writing, and functional math in the IEPs.  (Def. Facts ¶¶ 23, 30.)

17. In 2018, Ms. Weinberger conducted an Academic Assessment of J.G. and wrote a report dated February 5, 2018.  (Trial Ex. 31.)  The report states: "Javier attends a Special Day Program in a High School class consisting of 10 students.  The students have a wide range of abilities.  Javier is ambulatory and responds to moderate adult assistance and prompting.  Adults in the classroom consist of one (1) Special Education Teacher, two (2) Health Care Assistants, and one (1) Paraprofessional.  Due to the various needs of the students in the classroom, there are different tables which the students use. Six (6) of the students are in wheelchairs and four (4) are ambulatory. Classroom consists of a whiteboard for visual projection, computers, iPads, printers, desks, class schedule, monthly calendar, bulletin boards for school news and announcements.  Oxford Picture Dictionary and Unique Learning

System are part of the daily curriculum with whole group, small group, and individualized instructional setting." (<u>Id.</u> at 1.)

18. Anoush Boyajian is the Principal of Lowman. (Stip. Facts 6L.) Ms. Boyajian testified that she believed Lowman was the least restrictive environment for J.G. because he "had behavioral needs that needed to be addressed in a small classroom." (A. Boyajian Testimony 35:1–9.)

19. In or about 2018, Ms. Boyajian implemented an integration program, which allowed students from general education schools to visit Lowman. (Def. Facts ¶ 19.) This gave Lowman students, including J.G., an "opportunity to integrate with typical peers." (A. Boyajian Testimony 23:10–25.)

20. At the April 30, 2013 IEP meeting, the IEP team determined that Lowman was the most appropriate placement for J.G. because he "requires verbal instruction/prompting, physical prompting as needed, small group and individual instruction, positive reinforcement," and "communication devices." (Trial Ex. 21 at 22.)

21. At the March 20, 2014 IEP meeting, the IEP team began using a "Least Restrictive Environment Analysis" form. (Trial Ex. 22 at 22.) The form asked: "Can the supports, services, accommodations and/or modifications in the student's IEP be made available in a general education classroom/setting?" (<u>Id.</u>) The IEP team answered "No." (<u>Id.</u>) Then the form asked: "Can the supports, services, accommodations and/or modifications in the student's IEP be made available on a general education site in a special day program?" (<u>Id.</u>) The team again answered "No." (<u>Id.</u>)

22. At the March 2, 2015; February 29, 2016; February 15, 2017; February 12, 2018; and February 19, 2019 IEP meetings, the IEP team again answered "No" to both questions. That is, the IEP team determined that the supports, services, accommodations and/or modifications in J.G.'s IEP could ***not*** be made available in a general education classroom/setting or on a

general education campus in a special day program.  (Trial Ex. 23 at 30; Trial Ex. 26; Trial Ex. 27; Trial Ex. 33 at 23; Trial Ex. 45 at 29; Def. Facts ¶ 7.)

23. In response to the second question regarding a special day program on a general education campus, the 2015, 2016, 2017, 2018, and 2019 IEPs contained the exact same explanation: "Javier requires an educational environment that provides school-wide intensive therapy and a highly structured environment to learn daily living techniques, and incorporate these skills into his daily routine."  (Trial Ex. 23 at 30; Trial Ex. 26; Trial Ex. 27; Trial Ex. 33 at 23; Trial Ex. 45 at 29.)  With respect to school-wide intensive therapy, Ms. Cripe testified that "what we mean is all-inclusive, every staff member, everybody working together for Javier to be able to participate in things."  (L. Cripe Testimony 158:17–20.)

24. In addition to the February 19, 2019 IEP meeting, the IEP team reconvened on March 13, 2019 and on May 30, 2019.  (Trial Ex. 45 at 40–41.)  On or about June 5, 2019, J.G.'s mother expressed that J.G. had never received a psychoeducational evaluation from the school and that the supports, services, accommodations, and/or modifications in J.G.'s IEP can be made available on a general education site in a special day program.  (Id. at 43.)

25. On June 7, 2019, J.G. graduated from Lowman.

26. In August 2019, J.G. transferred to Sun Valley High School ("Sun Valley"), a general education campus with a special day program.  (Stip. Facts at 3.)

27. Lauren Foster is a special education teacher at Sun Valley who taught J.G. during the 2019–2020 school year.  (Stip. Facts 6I.)  Ms. Foster testified that J.G. "was able to integrate into" her "intellectually disabled moderate to severe" class.  (L. Foster Testimony 19:5–16.)  She also testified that J.G. "made significant progress" during that time.  (Id. 22:6.)

28. Jamal Speakes was a general education film production teacher at Sun Valley who taught J.G. during the 2019–2020 school year.  (Pl. Facts ¶ 16.)  In

Mr. Speakes's film production class, J.G. had an opportunity to collaborate on projects with typical peers in general education.  (J. Speakes Testimony 168:21–24.)  Mr. Speakes testified that J.G. was "cooperative.  He listened.  He followed directions."  (Id. 170:12.)

29. J.G.'s mother testified that since J.G. began attending Sun Valley, he "is more independent, he's learned more at Sun Valley School, and he knows how to communicate better with everyone," whereas he "made no progress" at Lowman.  (M. Flores Testimony 20:7–9, 12 [Day 2].)  J.G.'s father testified that "we thought [Lowman] was a good school because it was a special school.  Unfortunately, [J.G.] did not have the right support."  (J. Guerrero Testimony 8:22–24.)

30. Plaintiff's expert, Dr. Carlos Flores, a psychologist who performed J.G.'s independent psychoeducational evaluation in the fall of 2018, testified that he believed Lowman was not the least restrictive environment for J.G.  (C. Flores Testimony 82:5–7; Trial Ex. 82.)  Among the reasons Dr. Flores so concluded were that J.G. was "the highest functioning kid in the classroom," there was "no individualized attention," there was "significant noise" in the classroom, and there was no opportunity to socialize with typical peers.  (C. Flores Testimony 82:9–84:1.)

31. Plaintiff's expert, Dr. Mary A. Falvey, an inclusion expert, observed J.G. on September 12, 2019 at Sun Valley.  (M. Falvey Testimony 75:19–22; Trial Ex. 84 at 3.)  She concluded that J.G. was "thriving both socially and academically in his current placement" at Sun Valley.  (Trial Ex. 84 at 5.)  "Because he is thriving so well in his current placement it is unclear why the district denied him such a placement in the past.  There does not appear to be any evidence in his records, including his past IEPs that would warrant denying him placement in a general education school."  (Id.)

//

8

### C. **Augmentative and Alternative Communication**

32. Marshall Fenig is a District-employed speech-language pathologist assigned to Lowman at all times relevant to this case.  (Stip. Facts 6M.)

33. From 2006 to 2009, J.G. received direct, one-on-one language and speech ("LAS") services.  (Def. Facts ¶ 11.)  In 2009, J.G. received a Language and Speech Assessment, which found that "he has made minimal progress in his communication skills."  (Id. ¶ 12; Trial Ex. 11 at 4.)  The Assessment concluded that "the student is able to benefit from their Special Education program *without* LAS related services support."  (Trial Ex. 11 at 5.)

34. From 2014 to 2017, Mr. Fenig worked with J.G. through the communication support model, which involved Mr. Fenig visiting J.G.'s classroom once a week to work with the class on language, speech, and communication skills.  (M. Fenig Testimony 83:20–25; Def. Facts ¶ 13.)

35. At the February 15, 2017 IEP meeting, J.G.'s mother requested a speech assessment for J.G.  (Stip. Facts 6N.)

36. Mr. Fenig conducted a Language and Speech and Augmentative and Alternative Communication Assessment, and wrote a report dated June 1, 2017.  (Id. 6O.)  With respect to language and speech, the Assessment concluded that "LAS services and support may be necessary for the student to benefit from their Special Education program in the area of language."  (Trial Ex. 29 at 5.)  With respect to augmentative and alternative communication (AAC), the Assessment recommended a "multi-modal system to include Javier's current modes of communication along with a picture exchange system in conjunction with trials using a tablet with a communication app."  (Id.)

37. On June 2, 2017, the IEP team amended the previous February 15, 2017 IEP to include observations and recommendations from Mr. Fenig's LAS and AAC Assessment.  (Trial Ex. 30.)  The February 15, 2017 IEP listed J.G.'s

Assistive Technology equipment as pictures, switches, and voice output devices  (Trial Ex. 27), whereas the June 2, 2017 IEP listed J.G.'s Assistive Technology equipment as pictures, switches, and "tablet with communication app trials" (Pl. Facts ¶ 62; Trial Ex. 30).

38. Pursuant to the June 2, 2017 IEP, J.G. once again received direct, one-on-one LAS services with Mr. Fenig.  (Pl. Facts ¶ 52.)

39. Previously, J.G. used AAC devices that were implemented by the teacher in the classroom.  (M. Fenig Testimony 102:18–22.)  As a result of placing J.G. in LAS services directly, Mr. Fenig could "trial systems that were more specific to what [J.G.'s mother] was interested in."  (Id. 103:9–17.)

40. Mr. Fenig trialed J.G. with a Dynavox, a dynamic display system with communication software, similar to an iPad.  (Id. 118:16–22.)  J.G. had used the Dynavox in Ms. Weinberger's classroom before.  (Id. 118:3–5.)

41. However, J.G. often seemed to prefer other methods of communication. (L. Foster Testimony 29:19–30:3 ("Javier preferred not to use his AAC device."); S. Weinberger Testimony 61:14–22 ("Q. Was it difficult to get him to use communication devices in class?  A. Yes."); A. Boyajian Testimony 22:19–21 ("He did have an AAC device, but he was not fond of it.  He didn't use it consistently."); M. Fenig 147:24–148:4 ("[A]lthough he knew how to navigate the [Dynavox] and find things, when he had access to the system, he would touch the icons, and then he would do signs.").)

42. In or about 2017, based on the recommendation of an in-home therapist unassociated with the District, J.G.'s mother purchased an iPad for J.G. to use to communicate at home.  (Pl. Facts ¶¶ 82-83.)

43. Between February 2017 and June 2017, J.G.'s mother asked Mr. Fenig twice if J.G. could use his personal iPad at school.  (Id. ¶ 84.)

44. Mr. Fenig denied J.G.'s mother's request to bring J.G.'s personal iPad to school.  (Pl. Facts ¶ 90.)  Mr. Fenig testified that one of the reasons he

10

denied the request was because "there was a LAUSD policy that prohibited it based on liability concerns." (M. Fenig Testimony 96:23–97:1.) Another reason was that he didn't believe the personal iPad would help J.G. access the curriculum at school. (Id. 97:2–6.)

45. J.G.'s mother was concerned that J.G. could not take the Dynavox outside during recess. (Pl. Facts ¶ 86–88.)

46. When asked, "did you consider at the time [J.G.'s mother] made the request that having a personal iPad that [J.G.] could take outside would increase his communication beyond gestures and his sign language?", Mr. Fenig replied: "No, because the system that was chosen by the parent, which is totally fine for home use, was not assessed by the District to see if it was actually an appropriate system in the first place." (M. Fenig Testimony 99:5–12.)

47. At the February 12, 2018 IEP meeting, J.G.'s mother again requested that J.G. use his personal iPad at school. (Pl. Facts ¶ 85.) The IEP team noted: "AAC device discussed. Parent requesting student has same device in school as at home. Student uses a Dynovox [sic] system in school with an iPad at home." (Trial Ex. 33 at 28.)

48. On February 20, 2018, the IEP team "reconvened with student in attendance." (Id.) The team noted: "Discussion of LAS equipment for communication. District would like to trial a new APP and device. If Javier is successful a new IEP meeting would be held to add the new system. The dynovox [sic] is a system to use to determine Javier's interest in communicating. Recommendation is to continue use of dynamic display unit and trial new APP. LAS goal presented and discussed." (Id.)

49. On June 27, 2018, Ms. Weinberger wrote a note (translated into Spanish) to J.G.'s mother stating, the "speech therapist will contact the correct people to bring the iPad back. I also talked to him about taking the iPad from school to home and back, he will let me know more at a later date." (Trial Ex. 39.)

Ms. Weinberger testified that this note related to a District-issued iPad. (S. Weinberger Testimony 53:13–18.)

50. On September 20, 2018, Plaintiff's expert, Margaret Perkins, a speech-language pathologist, recommended that J.G. use a PRiO device with the LAMP Words for Life 84 software.  (Trial Ex. 43 at 17.)  Ms. Perkins concluded that J.G. requires a speech generating device that has the following characteristics and features: touchscreen, dynamic display, portable, vocabulary organization that allows for motor automaticity, individual icons that are word-based to allow for spontaneous novel utterances, word prediction, bilingual, ability to "look up" icons for a communication partner, among others.  (Id. at 16–17.)

51. Mr. Fenig trialed J.G. with a District-issued iPad with TouchChat MultiChat 15 Adolescent, "an app that was more sophisticated than the one that his home iPad had but was a little less complex than the one that Ms. Perkins recommended."  (M. Fenig Testimony 104:15–19.)

52. On May 20, 2019, Mr. Fenig emailed Ms. Perkins, writing, "I still feel the Touch Chat is appropriate for [J.G.'s] access to school since it already contains organized school based themes which he is showing progress with. Addressing your concerns . . . I said that I could set up the Touch Chat so that he could work on icon combinations as opposed to always doing rote phrases and that his AAC goal would reflect this as well."  (Trial Ex. 46 at 2.)  Ms. Perkins replied, "Either system will work as long as he is generating using a variety of: communication intents; parts of speech (e.g. asking questions as well as answering), vocabulary-semantics (e.g. qualitative comments); using single words that are multi-meaning . . . but I do think we are on the same page."  (Id.)

53. The District's Policy Bulletin 5540.0, "Assistive Technology Lending Libraries," dated August 16, 2011, provides: "Assistive technology devices

that are determined to be appropriate for trial may be borrowed . . . for up to 60 calendar days." (Trial Ex. 17.) Mr. Fenig was aware of this 60-day loan policy when he was working with J.G. (M. Fenig Testimony 95:20–22.)

54. Although Mr. Fenig testified that the District-issued iPad was J.G.'s device and that "[i]t wasn't really a trial" (id. 104:21–22), J.G. was not allowed to take the device home. (Pl. Facts ¶ 68.) Mr. Fenig testified that "it wasn't established if it was appropriate for it to go home yet." (M. Fenig Testimony 106:5–6.) Mr. Fenig explained that J.G. would be allowed to take the device home when J.G. "showed a more proficient use and interest in the system." (Id. 105:18–19.) At no point from 2014 to June 2019 was J.G. allowed to take a District-issued AAC device home. (Id. 90:13–17.)

55. On August 21, 2019, Keri Matsumoto, the speech-language pathologist at Sun Valley (Stip. Facts at 6H), authorized J.G. to take a District-issued iPad home. (Trial Ex. 47.)

56. J.G. has been permitted to bring his personal iPad to Sun Valley beginning in the 2019–2020 school year. (Stip. Facts 6Q.)

57. On September 19, 2019, Ms. Perkins discovered that J.G. was still using the TouchChat app. (Trial Ex. 49 at 9.) She had thought Mr. Fenig agreed that J.G. "needed a more robust system, he needed to be able to switch to Spanish, and he needed a word-based program. . . . I wasn't sure why that had not happened." (M. Perkins Testimony 30:8–13.)

58. J.G.'s parents are monolingual Spanish speakers. At no point was J.G. given a District-issued AAC device that could toggle between English and Spanish. (Id. 40:19–22.)

### D. Triennial Reevaluations

59. The District's Policy Bulletin 6639.0, "Three-Year Review Individualized Education Program (IEP) Psycho-Educational Reassessment Requirements," dated February 1, 2016, provides: "A reassessment of a

13

student with a disability shall be conducted at least once every three years or more frequently, if appropriate, unless the parent/guardian and the [Local Educational Agency] agree, in writing, that a reassessment is unnecessary." (Trial Ex. 24.)   Specifically, "the IEP team must determine at the [second] annual IEP Review whether or not a three-year comprehensive psycho-educational reassessment will be required as part of the upcoming three-year review IEP." (Id. at 2.)   "The IEP team's decision for reassessment must be documented . . . ." (Id. at 5.)   A "three-year review IEP *must* be held, regardless of the IEP team's decision to waive the formal comprehensive psycho-educational assessment." (Id. at 6.)

60. The policy states that a comprehensive psychoeducational three-year assessment *is required* and *may not be waived* (a) for all students with an eligibility of Emotional Disturbance (ED); (b) for students on the general education curriculum whose previous three-year reassessment had been waived; (c) at the first three-year review IEP following an initial psychoeducational assessment; (d) when a parent/guardian or other member of the IEP team makes a request; (e) when a student is transitioning from early education/preschool programs to elementary programs; (f) if a student is being considered for a change of curriculum from general curriculum to alternative curriculum, or vice versa; (g) when there is new information to suggest that the current eligibility is not appropriate; (h) when there is a significant change in health, behavior, or educational needs such that conditions would warrant a comprehensive reassessment; (i) prior to determining that a child is no longer a child with a disability.   (Id. at 4.)

61. The policy states that it may be *appropriate to waive* a three-year reassessment if "the student is on alternative curriculum and there is no evidence supporting the need to change the curriculum, eligibility, or program supports." (Id. at 5.)

14

62. J.G.'s parents never waived J.G.'s right to receive a psychoeducational evaluation at Lowman.  (M. Flores Testimony 19:25–20:2.)

63. Dr. Flores testified that a psychoeducational evaluation should be conducted every three years for a student with disabilities because it is an "objective standardized approach" that provides a "baseline" for assessing a child's current functioning.  (C. Flores Testimony 57:10–59:18.)  The evaluations help determine whether the student is making progress and whether the interventions are benefiting the student, or if they need to be modified.  (Id.)

64. At the September 30, 2005 IEP meeting, the IEP team selected the option for "formal assessment is needed to re-establish eligibility."  (Trial Ex. 2 at 16.)  The team noted, "Javier will have a CTAR by June 15, 2006 for transition to Kindergarten."  (Id.)  The June 8, 2006 IEP meeting was marked as a three-year review.  (Trial Ex. 4 at 1.)

65. At the September 24, 2008 IEP meeting, the IEP team selected the option for "formal assessment is needed to re-establish eligibility."  (Trial Ex. 10 at 24.)  The June 10, 2009 IEP meeting was marked as a three-year review.  (Trial Ex. 12 at 1.)  In 2009, J.G. received a Language and Speech Assessment.  (Def. Facts ¶ 12; Trial Ex. 11.)

66. At the June 7, 2011 IEP meeting, in response to the question, "Is formal assessment needed to re-establish eligibility?", the IEP team selected "No."  (Trial Ex. 14 at 23.)  The May 11, 2012 IEP meeting was marked as a three-year review.  (Trial Ex. 19 at 1.)

67. At the March 20, 2014 IEP meeting, in response to the question, "Is formal assessment needed to re-establish eligibility?", the IEP team selected "No."  (Trial Ex. 22 at 24.)  The March 2, 2015 IEP meeting was marked as a three-year review.  (Trial Ex. 23 at 1.)

68. At the February 15, 2017 IEP meeting, in response to the question, "Is formal assessment needed to re-establish eligibility?", the IEP team selected

15

"No." (Trial Ex. 27.)  The February 20, 2018 IEP meeting was marked as a three-year review. (Trial Ex. 33 at 1.)  At the February 20, 2018 IEP meeting, in response to the question, "Do the Parent and the District (local educational agency) agree that a reassessment is unnecessary?", the team selected "Yes." (Id. at 25.)

69. Maria Zaragoza was a school psychologist at Lowman from approximately 2012 to 2019. (M. Zaragoza Testimony 135:2; 136:6–7.)  During her tenure at Lowman, Ms. Zaragoza never conducted a psychoeducational evaluation of J.G. (Pl. Facts ¶ 104; M. Zaragoza Testimony 152:16–20.)  She testified that "there is specific guidance for the IEP team to determine when a psychoeducational reassessment is not necessary." (M. Zaragoza Testimony 155:12–14.)  For example, if "the eligibility has not changed and the student continues to make consistent expected progress," or there are "no significant health or behavior changes." (Id. 155:15–18.)

### E.  Administrative Proceedings

70. On April 5, 2018, J.G., by and through his parents, filed a due process complaint against the District with the Office of Administrative Hearings ("OAH") regarding J.G.'s educational program. (Pl. Facts ¶ 111.)

71. On May 21, 2018, J.G. settled all special education claims arising under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq., and over which OAH has jurisdiction. (Id. ¶ 112; Trial Ex. 36 at 1.)  Plaintiff specifically did not release any alleged or potential claims arising under the ADA or Section 504. (Trial Ex. 36 at 1.)

72. Pursuant to the Final Settlement Agreement, the District agreed to fund an independent psychoeducational evaluation of J.G. conducted by Dr. Flores, as well as an independent AAC evaluation of J.G. conducted by Ms. Perkins. (Id. at 1–2.)

73. Dr. Flores observed J.G. on August 1 and September 26, 2018, and wrote an independent psychoeducational evaluation report dated October 31, 2018. (Trial Ex. 44 at 1.)

74. Ms. Perkins observed J.G., and wrote an augmentative and alternative communication evaluation report dated September 20, 2018.  (Trial Ex. 43.)

75. On August 16, 2019, Plaintiff filed a second due process complaint against the District with the OAH regarding J.G.'s educational program from May 16, 2018 onwards.  (Pl. Facts ¶ 113.)

76. On October 8, 9, and 10, 2019, Administrative Law Judge ("ALJ") Alexa Hohensee heard the matter.  (Id. ¶ 115.)

77. The issues at the hearing were:  (1) Did the District deny J.G. a free appropriate public education ("FAPE") when it failed to offer J.G. (a) placement in the least restrictive environment from May 16, 2018 to June 7, 2019; and (b) appropriate AAC services from May 16, 2018 to August 16, 2019?  (2) Did the District deny J.G. a FAPE when it failed to implement J.G.'s AAC services at home during the 2019 extended school year?  (3) Did the District's May 30, 2019 IEP deny J.G. a FAPE by not offering appropriate AAC implementation training for J.G., his parents, and teachers?  (Id. ¶ 116.)

78. On November 18, 2019, ALJ Hohensee issued her decision.[1]  (Id. ¶ 117.) The District prevailed on all issues.  (Id.)

//

//

//

---

[1] ALJ Hohensee's November 18, 2019 decision was not admitted into evidence at trial.  Thus, the Court does not consider the decision as evidence and references it only to the extent this Court's prior orders incorporated it.

## II.  CONCLUSIONS OF LAW

1. J.G. is a person with a disability as defined by the ADA and Section 504 of the Rehabilitation Act.  (Stip. Facts 6A.)

2. The District receives federal financial assistance and is therefore subject to the ADA and Section 504 of the Rehabilitation Act.  (Id. 6F, 6G.)

3. The Court previously held that Plaintiff's ADA and Section 504 claims are not barred by the IDEA's exhaustion requirement because Plaintiff does not "seek[] relief that is also available under" the IDEA.  ("MTD Order," Dkt. No. 36 at 4.)  To determine whether a plaintiff who brought suit under a statute other than the IDEA seeks relief for the denial of a free appropriate public education ("FAPE"), such that the plaintiff is required to exhaust the IDEA's remedies, a court should look to the crux, or the gravamen, of the plaintiff's complaint, setting aside any attempts at artful pleading.  Fry v. Napoleon Cmty. Schs., 580 U.S. 154, 169 (2017).  This Court found that the gravamen of Plaintiff's complaint relates to the District's alleged failure to provide reasonable accommodations for J.G.'s disability, not to the denial of a FAPE.  (MTD Order at 5.)  The Ninth Circuit's opinion in D. D. by & through Ingram v. Los Angeles Unified Sch. Dist., 18 F.4th 1043, 1049 (9th Cir. 2021) (en banc), does not change this Court's analysis.

4. The Court also previously held that Plaintiff's claims are not barred by the statute of limitations because at least some of the District's alleged discriminatory acts and/or policy and practice occurred within the limitations period.  (MTD Order at 5.)  See Douglas v. Cal. Dep't of Youth Auth., 271 F.3d 812, 822 (9th Cir. 2001).

5. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

6. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).

7. "Although several material differences exist between them, see K.M. ex rel. Bright v. Tustin Unified Sch. Dist., 725 F.3d 1088, 1099 (9th Cir. 2013), to bring a suit under the ADA and Section 504 requires the same elements: (1) the child is a qualified individual with a disability; (2) [he] was denied a reasonable accommodation that [he] needs to enjoy meaningful access to the benefits of public services; and (3) the program providing the benefit receives federal financial assistance."  McIntyre v. Eugene Sch. Dist. 4J, 976 F.3d 902, 912 (9th Cir. 2020); see A.G. v. Paradise Valley Unified Sch. Dist. No. 69, 815 F.3d 1195, 1203–04 (9th Cir. 2016) ("[T]he elements of a valid Title II claim do not differ in any material sense from those of a valid section 504 claim and the two may be addressed together.").

8. Plaintiff asserts three theories of liability: (1) The District unlawfully segregated J.G. at Lowman; (2) the District denied J.G. access to effective communication; and (3) the District failed to conduct triennial reevaluations. ("Pretrial Conference Order," Dkt. No. 144 at 7–11.)

## A. Unlawful Segregation

9. The ADA preamble expressly defines unjustified segregation as a form of discrimination.  42 U.S.C. § 12101(5) ("[I]ndividuals with disabilities continually encounter various forms of discrimination, including . . . segregation."); see Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 599–600.

10. The relevant regulations specify that a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R.

19

§ 35.130(d); <u>see</u> 34 C.F.R. § 104.4(b)(iv).  The "most integrated setting appropriate" is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."  <u>Olmstead</u>, 527 U.S. at 592 (quoting 28 C.F.R. pt. 35, App. A (1998)).

11.  The Court previously granted partial summary judgment on Plaintiff's unlawful segregation claim from February 19, 2019 through May 30, 2019 because the OAH had "necessarily decided" that issue.  ("MSJ Order," Dkt. No. 83 at 11–12.)  The Court reasoned:  "In order to determine the merits of Plaintiff's IDEA claim, the OAH was required to assess whether J.G. was placed in the least restrictive learning environment from February to May of 2019—or whether J.G. could have been instructed and integrated in a general public school during the time."  (<u>Id.</u> at 11.)  The OAH found that Lowman was not the least restrictive environment ("LRE") for J.G.  (<u>Id.</u>)  "[B]y holding that Lowman was not the LRE for J.G., the OAH 'necessarily decided' the relevant issue under Section 504 and the ADA: whether the District administered J.G. education in the 'most integrated setting appropriate' from February to May of 2019."  (<u>Id.</u> (citation omitted).)  Thus, the Court held that collateral estoppel applied and granted partial summary judgment on Plaintiff's unlawful segregation claim.  (<u>Id.</u>)

12. Collateral estoppel does not apply to the period before February 19, 2019 because Plaintiff settled all LRE claims arising under the IDEA up to the date of the settlement agreement.  (Trial Ex. 36 at 4–5.)  Any claims that J.G.'s placement at Lowman was not the LRE before February 19, 2019 were not "actually litigated and decided in the prior proceedings," nor was there a "full and fair opportunity to litigate the issue."  <u>See</u> <u>Oyeniran v. Holder</u>, 672 F.3d 800, 806 (9th Cir. 2012) (citation omitted).

13. Plaintiff expressly did not release any claims arising under the ADA or Section 504.  (Trial Ex. 36 at 1.)

14. The Court now finds that J.G.'s placement at Lowman during the entirety of the 2018–2019 (twelfth grade) school year was not the "most integrated setting appropriate" or otherwise "necessary" to provide him with effective education services under the ADA and Section 504.  See 28 C.F.R. § 35.130(d);  34 C.F.R. § 104.4(b)(iv).  When Dr. Flores observed J.G. in Ms. Cripe's classroom on September 26, 2018, he noted that J.G. "seemed to perform at a higher cognitive level than the rest of the students in the class." (Trial Ex. 44 at 3.)  This observation, among others, led Dr. Flores to conclude that Lowman was not the appropriate placement: "J.G. should have been placed in an educational setting with peers at his same or higher functioning to meet his developmental needs." (Trial Ex. 82 at 1.)

15. Ms. Cripe testified that in general, the accommodations J.G. needed could be provided on a general education campus.  (L. Cripe Testimony 131:3–6.) Ms. Weinberger also testified that given those accommodations, J.G. could succeed anywhere.  (S. Weinberger Testimony 51:2–3.)

16. J.G.'s mother testified that J.G. did not experience any problems transitioning from Lowman to Sun Valley, a general education campus, in 2019.  (M. Flores Testimony 124:16–18 [Day 1].)  In fact, J.G.'s mother testified that he "is more independent, he's learned more at Sun Valley School, and he knows how to communicate better with everyone." (M. Flores Testimony 20:7–9, 12 [Day 2].)  Ms. Foster, who taught J.G. during the 2019–2020 school year, stated that J.G. made significant progress in her special day class at Sun Valley.  During that time, J.G. also had an opportunity to integrate with typical peers in a film production class.

17. The District presented no evidence why J.G. could not have been accommodated at Sun Valley prior to the 2019–2020 school year.

18. J.G.'s 2015, 2016, 2017, 2018, and 2019 IEPs all state that "Javier requires an educational environment that provides school-wide intensive therapy and a

highly structured environment to learn daily living techniques, and incorporate these skills into his daily routine." However, it is unclear what "school-wide intensive therapy" is and why J.G. continues to need it. That the explanation for J.G.'s placement remained the same year after year suggests that the IEP team may not have seriously considered other options.

19. The District's argument that J.G.'s mother approved all of J.G.'s IEPs, including his placement at Lowman, is inapposite. "[C]laims challenging the placement of a disabled child are not barred simply because the parents of the child consent, or fail to object, to such placement." <u>A.G.</u>, 815 F.3d at 1205. J.G.'s parents do not have, and could not be expected to have, "specialized expertise" regarding the appropriate placement for J.G. <u>See</u> <u>id.</u>

20. J.G.'s placement in a special education center was a more segregated setting than a special education day class on a general education campus. A general education campus provides J.G. with daily access to typical peers at lunch, during class transitions, and in general education elective classes such as film production. Ms. Cripe, Ms. Weinberger, and Ms. Foster testified that the accommodations, modifications, and supports J.G. required could have been provided on a general education campus. Therefore, Lowman was not the "most integrated setting appropriate" for J.G.'s needs during at least the 2018–2019 (twelfth grade) school year. The Court finds that J.G. was unnecessarily segregated at Lowman during the 2018–2019 school year in violation of the ADA and Section 504.

21. To recover monetary damages under the ADA or Section 504, "a plaintiff must prove intentional discrimination on the part of the defendant." <u>Duvall v. County of Kitsap</u>, 260 F.3d 1124, 1138 (9th Cir. 2001). A deliberate indifference standard applies. <u>Id.</u> "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." <u>Id.</u> at 1139.

22. "When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." Id.  The District was required by regulation to provide a public education in the "most integrated setting appropriate" to J.G.'s needs.  See 28 C.F.R. § 35.130(d).  Plaintiff has met the first element of the deliberate indifference test.

23. "[I]n order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness." Duvall, 260 F.3d at 1139.  "Because in some instances events may be attributable to bureaucratic slippage that constitutes negligence rather than deliberate action or inaction, we have stated that deliberate indifference does not occur where a duty to act may simply have been overlooked, or a complaint may reasonably have been deemed to result from events taking their normal course." Id.

24. Here, the Court finds that the District did not act with deliberate indifference in placing J.G. at Lowman during the 2018–2019 school year.  Each year, the IEP team, including J.G.'s mother, gathered to discuss J.G.'s progress, goals, and placement for the following school year.  For many years, Lowman was the appropriate placement for J.G.—until it wasn't.

25. In 2006, J.G. transferred to a general education campus, only to regress developmentally and return to Lowman after a few months.  In 2007, J.G.'s mother requested and the IEP team agreed to once again place J.G. on a general education campus, but for unknown reasons, the transfer did not happen.  No one on the IEP team, including J.G.'s mother, followed up regarding that placement in 2007.  Any potential LRE claim J.G. may have had regarding his 2007 placement is likely time-barred, and given the sparse

23

record before the Court regarding J.G.'s pre-high-school years, it cannot find that J.G.'s placement at Lowman constituted a continuing violation from 2007 to 2019.  J.G.'s mother did not renew her request to place J.G. on a general education campus until 2019.

26. Given that J.G. was previously unsuccessful on a general education campus, J.G.'s parents did not raise concerns about Lowman for more than a decade, and J.G. was making progress on his yearly IEP goals, the District could have reasonably believed that Lowman was the appropriate placement.  Although the District failed to proactively consider other placement options for J.G., its actions amount to "bureaucratic slippage" rather than deliberate inaction.  Thus, Plaintiff has not met the second element of the deliberate indifference test and is not entitled to recover damages from the District.

## B. Effective Communication

27. The ADA and Section 504 require public entities to provide reasonable accommodations to persons with disabilities to ensure that such persons enjoy meaningful access to the benefits of public services.  See K.M., 725 F.3d at 1102 (applying "meaningful access" standard to determine reasonable accommodation under the ADA); Mark H. v. Hamamoto, 620 F.3d 1090, 1097 (9th Cir. 2010) (applying "meaningful access" standard to determine reasonable accommodation under Section 504).

28. A "plaintiff may establish denial of 'meaningful access' under section 504 and Title II by showing there was a violation of one of the regulations implementing [the statutes], if such violation denied the plaintiff meaningful access to a public benefit."  A.G., 815 F.3d at 1204.

29. The effective communication regulations require a public entity to "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others."  28 C.F.R. § 35.160(a)(1).

Further, a public entity "shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." Id. § 35.160(b)(1); see K.M., 725 F.3d at 1096.

30. The Ninth Circuit has treated 28 C.F.R. § 35.160 as an "implementing regulation" of Title II of the ADA within the meaning of Alexander v. Sandoval, 532 U.S. 275 (2001). See Duvall, 260 F.3d at 1136. As such, this regulation is privately enforceable.

31. Here, the District did not deny J.G. meaningful access to a public education by failing to provide J.G. with a dedicated AAC device in a timely manner. J.G. used a multi-modal system to communicate. Between 2014 and 2019, J.G. had access to and used various AAC devices at school, including iPads with GoTalk and TouchChat apps, Dynavox, single-switch devices, and multi-switch devices. (M. Fenig Testimony 116:5–16; S. Weinberger Testimony 61:4–9.) Mr. Fenig trialed J.G. with a dedicated AAC device, but J.G. often seemed to prefer other methods of communication. (L. Foster Testimony 29:19–30:3 ("Javier preferred not to use his AAC device."); S. Weinberger Testimony 61:14–22 ("Q. Was it difficult to get him to use communication devices in class? A. Yes."); A. Boyajian Testimony 22:19–21 ("He did have an AAC device, but he was not fond of it. He didn't use it consistently."); M. Fenig 147:24–148:4 ("[A]lthough he knew how to navigate the [Dynavox] and find things, when he had access to the system, he would touch the icons, and then he would do signs.").)

32. Although the District was dilatory in assigning J.G. a dedicated AAC device, including authorizing its use at home, it did not fail to provide J.G. with appropriate AAC devices to ensure effective communication at school. J.G. always had means to communicate in and outside of the classroom, even if it

1    was not with his parents' preferred device.  (See S. Weinberger Testimony
2    51:19–23.)

3    33. The District also did not deny J.G. meaningful access to a public education
4        by denying his mother's request to let him use his personal iPad at school.  It
5        is well settled that the ADA and Section 504 "create a duty to gather
6        sufficient information from the [disabled individual] and qualified experts as
7        needed to determine what accommodations are necessary."  Updike
8        v. Multnomah Cnty., 870 F.3d 939, 954 (9th Cir. 2017) (alteration in
9        original) (citation omitted).  The reasonableness of an accommodation
10       provided to ensure effective communication "depends on the individual
11       circumstances of each case, and requires a fact-specific, individualized
12       analysis of the disabled individual's circumstances and the accommodations
13       that might allow him to [enjoy meaningful access to the program.]"
14       Hamamoto, 620 F.3d at 1098 (alteration in original) (citation omitted).

15   34. Mr. Fenig undertook a fact-specific investigation to determine whether J.G.
16       needed a reasonable accommodation.  J.G. did not express a preference for
17       his personal iPad over any other AAC device, including a District-issued
18       iPad.  Ms. Perkins, an independent speech-language pathologist,
19       recommended that J.G. use a more complex system than what was installed
20       on his personal iPad.  Ms. Perkins also did not offer an opinion as to whether
21       J.G. should use his personal iPad or a District-issued iPad.  Given these
22       considerations, Mr. Fenig reasonably concluded that J.G. did not require his
23       personal iPad to access his education.  See McCullum v. Orlando Reg'l
24       Healthcare Sys., Inc., 768 F.3d 1135, 1147 ("The regulations do not require
25       [public entities] to supply any and all auxiliary aids even if they are desired
26       and demanded.").  The District had already provided alternative means of
27       effective communication.  Accordingly, the District did not violate the ADA
28       and Section 504 by denying Plaintiff his right to effective communication.

**C. Triennial Reevaluations**

35. Plaintiff argues that the District violated the ADA and Section 504 by failing conduct a psychoeducational assessment of J.G. once every three years.

36. As discussed above, a plaintiff may establish his ADA or Section 504 claim "by showing there was a violation of one of the regulations implementing [the statutes], if such violation denied the plaintiff meaningful access to a public benefit." A.G., 815 F.3d at 1204. To support such a claim, the regulation must be an "implementing regulation" within the meaning of Alexander v. Sandoval. Id. "According to Sandoval, regulations can only be enforced through a private right of action contained in a statute when they 'authoritatively construe' the statute; regulations that go beyond a construction of the statute's prohibitions do not fall within the implied private right of action, even if valid." Mark H. v. Lemahieu, 513 F.3d 922, 935 (9th Cir. 2008). Not every violation of a regulation promulgated pursuant to Title II of the ADA or Section 504 supports a privately enforceable cause of action. T.L. by Layne v. S. Kern Unified Sch. Dist., 2018 WL 1960605, at *4 (E.D. Cal. Apr. 26, 2018).

37. Plaintiff cites regulations that require the District to reevaluate a child with a disability "at least once every 3 years, unless the parent and the public agency agree that a reevaluation is unnecessary." 34 C.F.R. § 300.303; see also id. § 300.304. Although the Ninth Circuit has indicated that the regulation requiring a school district to provide a FAPE to each child with a disability, 34 C.F.R. § 104.33, is "tightly enough linked" to Section 504 that it "authoritatively construes" that statutory section, no court in this Circuit has held the same for the reevaluation regulation, 34 C.F.R. §§ 300.303–304. See Lemahieu, 513 F.3d at 939; see also P.P. v. Compton Unified Sch. Dist., 135 F. Supp. 3d 1098, 1119 (C.D. Cal. 2015) (holding that 34 C.F.R. §§

104.33, 104.36, and 104.32, "as invoked in this case," are a "variety of meaningful access regulation[s]" and therefore privately enforceable).

38. Plaintiff failed to argue at trial that the cited regulations are implementing regulations of either of the statutes under which he brought his claims.  As such, the Court cannot hold that the reevaluation regulations, 34 C.F.R. §§ 300.303–304, are privately enforceable under Sandoval.

39. For the foregoing reasons, the Court concludes that the District violated the ADA and Section 504 by unlawfully segregating J.G. at a special education center during the 2018–2019 school year.  However, the District did not act with deliberate indifference and Plaintiff is not entitled to recover monetary damages.

Dated: February 21, 2023

THE HONORABLE JESUS G. BERNAL
United States District Judge